IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-03967-PAB

UNITED STATES OF AMERICA,
    Plaintiff
v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,
    Defendant.

**MOTION OF COMMON CAUSE, KYLE GIDDINGS, AND ANNE KEKE
TO INTERVENE AS DEFENDANTS**

Common Cause, Kyle Giddings, and Dr. Anne Keke (collectively, "Proposed Intervenors") respectfully move to intervene as Defendants pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, pursuant to Rule 24(b), and set forth the legal argument necessary to support their motion below.[1] Proposed Intervenors append as Exhibit 1 to this motion a proposed motion to dismiss by way of a response to the United States' Complaint. *See* Fed. R. Civ. P. 24(c).

## INTRODUCTION

The United States seeks to force Colorado to turn over voters' sensitive personal information and data. It has been widely reported that the United States intends to use this data to build an unauthorized national voter database and to target voters for potential challenges and disenfranchisement.

---

[1] **Certification Pursuant to D.C.Colo.LCivR. 7.1:** Proposed Intervenors conferred with Plaintiff and Defendant about this motion. Both indicated that they do not take a position on this motion.

1

Proposed Intervenors are Common Cause, a non-partisan organization dedicated to grassroots voter engagement in Colorado, whose members and whose own work are at risk by the relief the federal government seeks in this case, and voters who are directly threatened, Kyle Giddings and Dr. Anne Keke. Proposed Intervenors have a strong interest in preventing the disclosure of Colorado's most sensitive non-public voter data. Common Cause has an interest in protecting the voting and privacy rights of its members and all Colorado voters. The relief the federal government seeks risks discouraging Coloradans from registering to vote, undermining its work. And the privacy and voting-rights interests of Common Cause's members and of Mr. Giddings and Dr. Keke are also directly at stake. Proposed Intervenors include members of some of those groups who are under particular threat from the United States' requested relief, including voters who are naturalized citizens or who have a prior felony conviction.

Proposed Intervenors are entitled to intervene as of right under Rule 24 as this motion is timely, their rights and interests are at stake, and those rights and interests are not adequately represented by Defendant, who unlike Proposed Intervenors, is a state actor, subject to broader considerations external to the legal issues presented in this case. Their unique interests, perspective, and motivation to interrogate the purpose of the sweeping request for non-public voter data will ensure full development of the record and aid the Court in its resolution of this case. Intervention as of right pursuant to Rule 24(a), or in the alternative permissive intervention pursuant to Rule 24(b), should be granted.

## BACKGROUND

### A. DOJ's Efforts to Obtain Private Voter Information

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Dec. 19, 2025), https://perma.cc/A4A4-737Z. On May 12, 2025, DOJ sent a letter to the Colorado Secretary of State ("the Secretary"), apparently based on "a complaint alleging noncompliance by [her] office with the duties outlined in 52 U.S.C. § 20507," demanding, "[a]ll records, as outlined in 52 U.S.C. § 20701, and a certification that no record required for preservation has been deleted, destroyed or altered from its original format." Compl. ¶¶ 20–21; Pl.'s Ex. 1, Letter from Harmeet K. Dhillon to Jena Griswold dated May 12, 2025, Dkt. No. 5-1 at 2. As it did not detail particular records of interest, DOJ sought "*all records and papers* which [came] into [the Secretary's] possession *relating to any application, registration*, . . . *or other act requisite to voting*" from "any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives" that had occurred within 22 months of the letter. 52 U.S.C. § 20701 (emphasis added).

On December 1, 2025, a DOJ attorney emailed the Secretary's office offering an MOU that would functionally federalize the state's voter list maintenance, *see* Ex. 2, U.S. Dep't of Just., C.R. Div., Confidential Mem. of Understanding ("MOU"), and seeking the unredacted statewide voter list. *See* Compl. ¶ 24; Pl.'s Ex. 2, Email from Eric Neff to

3

Deputy Sec'y of State Andrew Kline (Dec. 1, 2025), Dkt. No. 5-1 at 5. He requested a response by the next day. *Id.* Colorado declined. *See* Pl.'s Ex. 3, Email from Deputy Sec'y of State Andrew Kline to Eric Neff (Dec. 2, 2025), Dkt. No. 5-1 at 7. The United States responded by filing this lawsuit, which is one of at least twenty-two similar suits seeking disclosure of sensitive voter data.[2]

The federal government's requests for private, sensitive voter data appears to be in connection with never-before-seen efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize voter rolls. According to reporting, federal government employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating in these unprecedented efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from both agencies. *Id.* A recent article extensively quoted a lawyer who recently left DOJ's Civil Rights Division, describing the government's aims in this case and others like it:

---

[2] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside government who have previously sought to disenfranchise voters and overturn elections.[3] Such actors have previously sought to compel states to engage in aggressive purges of registered voters and have abused voter data to mass challenge voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group affiliated with current DHS official, Heather Honey, challenging Pennsylvania's list maintenance practices was meritless).[4]

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters/; Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials).

[4] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-

5

The federal government's actions also indicate that it may target specific groups of voters in its use of the requested data. In its letters to other states, DOJ also requested information focusing on vote by mail, history of felony convictions, and citizenship status.[5] The Administration has also confirmed that it was sharing the requested information with the DHS. Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security.

### B. Proposed Intervenors

Proposed Intervenor Common Cause is a nonpartisan organization committed to, *inter alia*, ensuring that all eligible Colorado voters register to vote and exercise their right of vote at each election. *See* Ex. 3, Decl. of Colorado Common Cause Executive Director Aly Belknap ("Belknap Decl.") ¶¶ 5–7, 9–10. Common Cause expends significant resources conducting voter engagement and assistance efforts, including registering qualified people to vote, helping voters navigate the vote-by-mail process, encouraging participation, and assisting voters who face problems trying to vote. *See* Belknap Decl. ¶¶ 9–10, 13. The success of these efforts, especially with respect to voter registration, depend on voters' trust that, when they provide personal information to the State as part

---

ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections").

[5] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Ex. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Ex. A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan).

of the registration process, that information will not be abused, their privacy will be respected, and their right to participate will be honored. *See* Belknap Decl. ¶¶ 10–11.

Common Cause has over 24,000 members in Colorado. *See* Belknap Decl. ¶ 4. Those members include Colorado voters, whose personal data will be provided to the federal government if the United States prevails in this lawsuit. *See* Belknap Decl. ¶ 6. Common Cause's members in Colorado and the individual Proposed Intervenors include voters who are at particular risk of being caught up in the DOJ's efforts to remove voters from voter rolls, whether because they have a supposed "duplicate" record in the system, registered to vote by mail, have a felony conviction, and/or are naturalized citizens. *See* Belknap Decl. ¶¶ 6, 11–12; Ex. 4, Decl. of Kyle Giddings ("Giddings Decl.") ¶¶ 1–2, 4 (Colorado voter with prior felony conviction); Ex. 5, Decl. of Dr. Anne R. Keke ("Keke Decl.) ¶¶ 6–10 (Colorado voter who is a naturalized citizen). They also may include voters whose identifying information is particularly important to keep private, for example, due to their status as victims of domestic violence. *See* Belknap Decl. ¶¶ 11–12; Colo. Rev. Stat. §§ 24-30-2104, 2108, 2109 (establishing address confidentiality program and making it a misdemeanor to disclose or receive an address subject to the program).

## ARGUMENT

### I. Movants Are Entitled to Intervene as a Matter of Right.

In the Tenth Circuit, a party is entitled to intervene as of right under Fed. R. Civ. P. 24(a) upon establishing: "(1) the application is timely; (2) the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) the applicant's interest may as a practical matter be impaired or impeded; and (4) the applicant's interest

7

is not adequately represented by existing parties." *United States v. Albert Inv. Co.*, 585 F.3d 1386, 1390 (10th Cir. 2009) (quotation marks and brackets omitted). The Tenth Circuit takes a "liberal" approach to intervention, *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996), and "the requirements for intervention may be relaxed in cases raising significant public interests," *Kane Cnty. v. United States* (*Kane II*), 928 F.3d 877, 890 (10th Cir. 2019). "The central concern in deciding whether intervention is proper is the practical effect of the litigation on the applicant for intervention." *Barnes v. Sec. Life of Denver Ins. Co*., 945 F.3d 1112, 1121 (10th Cir. 2019) (citation omitted). Because the Proposed Intervenors meet Rule 24(a)'s requirements, the Court should grant their intervention as a matter of right.

**A. The Motion to Intervene Is Timely.**

Timeliness is determined "in light of all of the circumstances." *Okla. ex rel. Edmondson v. Tyson Foods, Inc*., 619 F.3d 1223, 1232 (10th Cir. 2010) (quotation marks omitted). Three non-exhaustive factors are "particularly important: (1) the length of time since the movants knew of their interests in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants." *Id*. (citation omitted).

This motion is timely. The suit was filed on December 11, 2025, and, upon learning of it, Proposed Intervenors promptly prepared this motion. *Cf. W. Energy All. v. Zinke*, 877 F.3d 1157, 1164–65 (10th Cir. 2017) (timeliness satisfied when "conservation groups moved to intervene just over two months" after the complaint was filed, resulting in a "lack of prejudice" to plaintiff); *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1251 (10th Cir. 2001) (timelines satisfied even when intervenor moved to intervene three years after the

8

start of the litigation, considering "the relatively early stage of the litigation and the lack of prejudice to plaintiffs"). Defendant has not yet filed her response, meaning that the case is at its earliest stages and the existing partes would not be prejudiced. In contrast, Proposed Intervenors will be substantially prejudiced absent intervention, given the serious threats that the relief sought poses to Proposed Intervenors' fundamental rights.

### B. Proposed Intervenors Have Concrete Interests in the Litigation.

Proposed Intervenors have a "sufficient"—*i.e.*, a "significantly protectable"—interest in the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). A protectable interest is one that "would be 'impeded by the disposition of the action.'" *San Juan Cnty., Utah v. United States*, 503 F.3d 1163, 1203 (10th Cir. 2007) (en banc), *abrogated on other grounds by Hollingsworth v. Perry*, 570 U.S. 693 (2013) (citation omitted). Here, Proposed Intervenors offer multiple, independently sufficient interests.

*First*, Proposed Intervenors have a right to privacy in the sensitive data sought, i.e., the entire unredacted voter file, "with all fields, including . . . state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." Compl. at 6-7. Sensitive information like driver's license numbers and Social Security numbers are protected from disclosure by Colorado law. Colo. Rev. Stat. § 1-2-302. The data sought is also protected by federal law, which prohibits the creation of a national voter database of the type that the United States is reportedly assembling. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation of any database "describing how any individual exercises rights guaranteed by the First Amendment," which includes exercising the right to vote). These privacy interests are significant and inure to Mr. Giddings, Dr. Keke, and

9

to Common Cause's members who are Colorado voters. *See* Belknap Decl. ¶¶ 10–11; Giddings Decl. ¶¶ 1, 4–5; Keke Decl. ¶ 8–11.

*Second*, and based on the United States' similar requests to other States, the data sought is likely to be used to challenge the registration of certain Coloradans, including voters with prior felony convictions, voters who are naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization), and voters who vote by mail. *See supra* 5–6 & n.3–5. Mr. Giddings, Dr. Keke, and Common Cause members fall within those categories. *See* Belknap Decl. ¶¶ 11–12; Giddings Decl. ¶¶ 2, 4; Keke Decl. ¶¶ 8–11. And Common Cause's members, especially those most likely to be targeted using the data sought, have a concrete interest in not being disenfranchised by so-called "election integrity measures."

*Third*, Common Cause as an organization has a protectable interest at stake as their core mission will be harmed if the relief that the federal government seeks is granted. Common Cause's voter registration activities will be harmed as voters will be chilled from registering if they believe their sensitive personal data will be provided to the federal government and potentially misused as part of a national database. Belknap Decl. ¶¶ 11–13; *see also* Giddings Decl. ¶ 4. Mass challenges by "election integrity" activists now wielding the power of the federal government will force Common Cause to redirect resources to mitigating the attempted disenfranchisement of existing voters, away from core activities of registering voters and engaging new voters in the democratic process. *Id.* ¶ 12. Courts routinely find that non-partisan organizations, like Common Cause, should be granted intervention in election-related cases, due to their significantly

10

protectable interests related to voting. *See, e.g.*, *Texas v. United States*, 798 F. 3d 1108, 1111–12 (D.C. Cir. 2015); *Kobach v U.S. Election Assistance Comm'n*, No. 13-cv-04095, 2013 WL 6511874, at *1–2 (D. Kan. Dec. 12, 2013). This case is no exception. Indeed, in a similar case brought over California's refusal to turn over sensitive voter information, such organizations were granted intervention. *See* Order, *United States v. Weber*, No. 25-cv-09149, (C.D. Cal. Nov. 19, 2025), Dkt. No. 70.

### C. Disposition of this Case May Impair the Proposed Intervenors' Interests.

Proposed Intervenors' interests would be impaired if Plaintiff succeeds in obtaining its requested relief. This third element "presents a minimal burden," requiring movants to show only that "it is 'possible' that the interests they identify will be impaired." *W. Energy All.*, 877 F.3d at 1167 (citation omitted). "Where a proposed intervenor's interest will be prejudiced if it does not participate in the main action, the mere availability of alternative forums is not sufficient to justify denial of a motion to intervene." *Clinton*, 255 F.3d at 1254. Here, the threat of impairment is significant. Plaintiff proposes to summarily dispose of voters' interests by obtaining an immediate order compelling the disclosure of private voter data, bypassing the normal civil litigation process and any discovery into "the basis and the purpose" of their request, 52 U.S.C. § 20703. *See* U.S. Mot. to Compel Prod. of Recs., Dkt. No. 2. This attempt to secure the irrevocable disclosure of private voter data at the very beginning of the case militates strongly in favor of allowing Proposed Intervenors into the case to represent voters' interests.

Finally, the Tenth Circuit has recognized that "the *stare decisis* effect of the district court's judgment is sufficient impairment for intervention under Rule 24(a)(2)." *Clinton*,

255 F.3d at 1254. In *Clinton*, a judgment in favor of plaintiffs challenging the designation of a national monument would have "impair[ed] the intervenor [environmental groups'] interests in promoting their environmental protection goals by seeking presidential designation of other national monuments in the future." *Id.* Common Cause maintains an active and ongoing interest in protecting the privacy of voters' sensitive personal data. Accordingly, a judgment in favor of Plaintiff—endorsing its legal theories and granting the requested relief—would have a *stare decisis* effect that could harm Common Cause's ability to oppose future efforts that undermine voters' privacy interests.

### D. The Secretary's Interests Differ from Those of Proposed Intervenors.

Proposed Intervenors' burden to show that "existing parties may not adequately represent its interest" is "minimal, and it is enough to show that the representation may be inadequate." *Kane II*, 928 F.3d at 892 (cleaned up). They meet this minimal burden here. Notably, "the possibility of divergence of interest need not be great, and this showing is easily made when the representative party is the government." *Id.* (cleaned up). Indeed,

> the government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor. . . . This potential conflict exists even when the government is called upon to defend against a claim which the would-be intervenor also wishes to contest.

*Clinton*, 255 F.3d at 1255–56; *see also Kobach*, 2013 WL 6511874, at *4 (voting rights organization's interests could reasonably diverge from those government defendants).

This litigation fits precisely these circumstances. As a government official, the

12

Secretary has a generalized interest in carrying out her office's legal obligations and in minimizing burdens on governmental employees and resources. She also must consider broader public policy concerns, in particular, the need to maintain working relationships with federal officials. In contrast, Proposed Intervenors bring a distinct, particular interest to this litigation, making the existing representation inadequate: the perspective of civil rights groups whose sole commitment is to ensuring access to the ballot and individual voters whose own rights are at risk. *T-Mobile Northeast LLC v. Town of Barnstable*, 969 F.3d 33, 40 (1st Cir. 2020). There may be arguments and issues that Defendant may not raise that are critical to organizations like Common Cause. For example, individual voters have a more direct injury than states under the Privacy Act for misuse of their personal data, especially given that the Privacy Act grants individuals an express right to bring suit. *See* 5 U.S.C. § 552a(g)(1)(D) ("Whenever an agency fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency"). As another example, courts have found a risk that considerations external to the issues presented by a case like this can motivate officials to pursue a settlement that could jeopardize the private information of Proposed Intervenors or of their members. *See Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-1867, 2024 WL 3454706, at *5 (N.D. Ill. July 18, 2024) (allowing intervention in NVRA case and observing that "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party"); *cf. Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 198 (2022) (reversing denial of motion to intervene where North Carolina

Board of Elections was "represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns").

These diverging perspectives—between the government's general need to balance various considerations and the Proposed Intervenors' personal and particular interest in the privacy of their own data—present a classic scenario supporting intervention. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 110–11 (M.D. Pa. 2011) (allowing public interest groups to intervene, "[b]ecause the EPA represents the broad public interest . . . not only the interests of the public interest groups"); *Kobach*, 2013 WL 6511874, at *4.

## II. In The Alternative, The Court Should Grant Permissive Intervention

Should the Court decline to grant intervention as of right, the Court should use its broad discretion to grant permissive intervention. *See Kane Cnty. v. United States*, 597 F.3d 1129, 1135 (10th Cir. 2010) (citation omitted). "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion, the district court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

As discussed above, this motion is timely, there will be no delay or prejudice to the adjudication of the existing parties' rights, and their interests are not adequately represented by any of the existing parties. And Proposed Intervenors' defense goes directly to the matters at issue, such as (1) whether federal law permits Plaintiff to force

14

Colorado to give it the personal information sought; (2) whether federal and state legal privacy protections prohibit disclosure of that information; and (3) whether the United States' motivations for the data sought are permissible. Proposed Intervenors' distinct perspective on the issues will complement or amplify Defendant's arguments and sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it.

Because of this unique perspective, district courts routinely grant permissive intervention to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Republican Nat'l Comm. v. Aguilar*, 2024 WL 3409860, at *1–3 (D. Nev. July 12, 2024) (permitting intervention by voter advocacy group as defendant in litigation seeking purge of voter rolls). The Court should do the same here.

## CONCLUSION

For all these reasons, the Motion should be granted.

Dated:  December 19, 2025                                  Respectfully submitted,

/s/ Theresa J. Lee

Theresa J. Lee                                             Timothy R. Macdonald, Bar No. 29180
Sophia Lin Lakin[*]                                        Sara Neel, Bar No. 36904
American Civil Liberties Union Foundation                  American Civil Liberties Union of Colorado
125 Broad Street, 18th Floor                               303 E. 17th Avenue, Suite 350
New York, NY 10004                                         Denver, CO 80203
(212) 549-2500                                             (303) 777-5482
tlee@aclu.org                                              tmacdonald@aclu-co.org
slakin@aclu.org                                            sneel@aclu-co.org

Patricia J. Yan
American Civil Liberties Union Foundation
915 15th Street NW                                         [*]admission pending
Washington, DC 20005
(202) 457-0800
pyan@aclu.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.


/s/ Theresa J. Lee