# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB

UNITED STATES OF AMERICA,
          Plaintiff

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,
          Defendant.

**[PROPOSED] MOTION TO DISMISS OF COMMON CAUSE,
KYLE GIDDINGS, AND ANNE KEKE**

**INTRODUCTION**

The United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and its attempt to summarily dispose of this case via an improper motion to compel should be rejected.[1]

Congress has repeatedly legislated to ensure that all eligible Americans can participate in free, fair, and secure elections. As the U.S. Department of Justice ("DOJ") has explained, Title III of the Civil Rights Act of 1960 ("Title III" or "CRA"), the provision invoked here, was designed to "secure a more effective protection of the right to vote."

---

[1] Proposed Intervenors' Motion to Dismiss responds to both Plaintiff's Complaint and its Motion to Compel. Rather than submit two separate responses to Plaintiff's filings, Intervenors have filed a single combined motion opposing the relief that Plaintiff requests. Proposed Intervenors' Motion is 18 pages and respectfully requests leave of court, to the extent necessary, to file an 18-page Motion to Dismiss.

1

U.S. Dep't of Just., C.R. Div., Federal Law Constraints on Post-Election "Audits" (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956, at 7 (1959)).

The federal government's demand for Colorado's unredacted voter file—which contains sensitive personal information including driver's license numbers and/or Social Security numbers from millions of Coloradans—undermines the CRA's core purposes and is contrary to law. Releasing voter records without redaction and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here, where the United States has not fully and accurately set forth "the basis and the purpose" for its data request, as required by the very statute that it invokes. 52 U.S.C. § 20703. The Court should dismiss.

## BACKGROUND

Beginning in May 2025, Plaintiff United States, through its DOJ, began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Dec. 19, 2025), https://perma.cc/A4A4-737Z.

On May 12, 2025, DOJ sent a letter to the Colorado Secretary of State ("the Secretary"), based on "a complaint alleging noncompliance by [her] office with the duties outlined in 52 U.S.C. § 20507," demanding, "[a]ll records, as outlined in 52 U.S.C. § 20701, . . . ." Compl. ¶¶ 20–21; Pl.'s Ex. 1, Letter from Harmeet K. Dhillon to Jena

2

Griswold dated May 12, 2025, Dkt. No. 5-1 at 2 ("May 12 Letter"). This means the demand included "*all records and papers* which [came] into [the Secretary's] possession *relating to any application, registration*, . . . *or other act requisite to voting*" from "any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives" within the previous 22 months. 52 U.S.C. § 20701 (emphasis added).

On December 1, 2025, a DOJ attorney emailed the Secretary's offering an MOU that would functionally federalize the state's voter list maintenance, *see* Ex. 2, U.S. Dep't of Just., C.R. Div., Confidential Mem. of Understanding ("MOU"), and seeking the unredacted statewide voter list. *See* Compl. ¶ 24; Pl.'s Ex. 2, Email from Eric Neff to Deputy Sec'y of State Andrew Kline (Dec. 1, 2025), Dkt. No. 5-1 at 5 ("Neff Email"). He requested a response by the next day. *Id.* Colorado declined. *See* Pl.'s Ex. 3, Email from Deputy Sec'y of State Andrew Kline to Eric Neff (Dec. 2, 2025), Dkt. No. 5-1 at 7. This suit followed, one of at least twenty-two similar suits.

But the federal government's request does not appear to relate to voter roll list maintenance under the NVRA, 52 U.S.C. § 20507, the statute invoked in the May 12 Letter. According to reporting, federal employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. One recent article extensively quoted a lawyer who recently left DOJ's Civil Rights Division, describing the Administration's aims in these cases:

3

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html. Additional reporting reveals self-proclaimed "election integrity" advocates who have previously sought to disenfranchise voters and overturn elections are involved in these efforts. *See* Mot. to Intervene as Defs. at 5 & n.4. In its letters to other states, DOJ also requested information focusing on vote by mail, history of felony convictions, and citizenship status.[2] Because the federal government has not provided a statutorily sufficient basis and purpose to support its request for Colorado's unredacted voter file, the relief should be denied and the Complaint dismissed.

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P.

---

[2] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Ex. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Ex. A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

12(b)(6). A court need not accept a complaint's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor can "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," survive a motion to dismiss. *Id*. at 678–79. Courts will grant a motion to dismiss when, even if they "take all well-pleaded facts in the complaint as true, the plaintiffs have failed to present a plausible right to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). In assessing a complaint, courts can "consider documents subject to judicial notice, including . . . matters of public record" and "documents that are both central to the plaintiffs' claims and to which the plaintiffs refer in their complaint," in addition to the information within the four corners of the complaint. *Mbaku v. Bank of Am., Nat'l Ass'n*, No. 12-CV-00190-PAB-KLM, 2013 WL 425981, at *1 n.2 (D. Colo. Feb. 1, 2013) (citations omitted).

## ARGUMENT

### I. THE UNITED STATES' DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.

The United States' demand for Colorado's full, unredacted voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for Colorado's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, any records should be redacted to vindicate the privacy and constitutional rights of Colorado voters. Nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters. So Plaintiff is not entitled to its requested relief.

**A. The United States' Demand Fails to Meet the CRA's Requirements.**

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand shall contain a statement of *the basis and the purpose therefor*." *Id*. (emphasis added).

The federal government's requests fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted voter file. *Id*. The Complaint

6

offers only the conclusory allegation: "The written demand 'contain[ed] a statement of the basis and the purpose therefor.'" Compl. ¶ 27 (citation omitted). And DOJ's letter referenced one complaint of supposed noncompliance with Section 8 of the NVRA to demand all records held by the Secretary, though not specifying the unredacted voter file now sought. Compl. ¶¶ 20–21; May 12 Letter. Neither the Complaint nor the letter alleges any evidence of anomalies or anything amiss with Colorado's list maintenance. *See* Compl.; May 12 Letter.

Contemporaneous case law immediately following Title III's enactment shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). Indeed, "basis" and "purpose" under Title III have consistently been treated as distinct concepts. *See id.*; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

Even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the request for the full and unredacted voter file. It does not explain why unredacted voter files are necessary to determine whether Colorado has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. And in fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a

7

"reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 12; 52 U.S.C. § 20507 (a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the State's discretion. *See* 52 U.S.C. § 20507(a)(4), (c)(1); *id*. § 21083(a)(2)(A); *id*. § 21085. The procedures carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Colorado's voter list at a single point in time, that would not amount to Colorado failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible").

The basis and purpose requirements are critical safeguards that prevent the statute from being used as a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. The statutory basis and purpose requirements are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. In the context of administrative subpoenas, and specifically in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *United States v. Powell*, 379 U.S. 48, 57 (1964), and that such subpoenas "may not be so broad so as to be in the nature of a 'fishing expedition,'" *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988). Such purpose requirements ensure

that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation via administrative subpoena).

As such, even if some other voting records or some portion of the voter file were necessary to investigate Colorado's NVRA list maintenance compliance, May 12 Letter at 2, the United States has not provided any justification for why the full unredacted voter file is necessary. For decades, DOJ has neither sought nor required a full, unredacted voter file in its NVRA compliance investigations. The United States' failure to articulate the basis and the purpose for its demand is another reason it is insufficient as a matter of law.

Title III's basis and purpose requirement is especially important here, where public reporting and public, judicially noticeable documents show that the federal government did not disclose the main basis and purpose for its demand: building a national voter file for its own use, to be shared with other agencies for unlawful purposes. *See supra* 3–4. As Congress has never authorized the creation of such a database, its creation would violate the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote).

The federal government's failure to fully and accurately provide this information is fatal. Section 303 requires a statement of "the basis and the purpose" of a records request, and by twice using the definite article, the statute requires not just a basis or purpose among many, but the actual basis and purpose underlying the request. *See Niz-*

*Chavez v. Garland*, 593 U.S. 155, 165–166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and indefinite article). This is yet another ground for dismissal.

Setting aside this fatal deficiency, compliance with the NVRA and HAVA cannot be the true basis and purpose for these data requests based on the United States' own more recent statements to States in connection with the requests. Far from ensuring compliance with these laws, the MOU that the federal government proposed to Colorado, *see* Compl. ¶ 24; Neff Email, runs afoul of them, *see* MOU.[3]

The NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), and the NVRA includes safeguards to protect voters from erroneous removal. But the MOU that the government proposed indicates multiple contemplated violations of those statutory requirements. First, it seeks to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text, *id*. § 21085 (methods of complying with HAVA "left to the discretion of the State"). MOU at 2, 5. Second, its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a way that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. This now-public MOU shows that the United States' supposed purpose is not in compliance with federal law but aggrandizes authority to a federal

---

[3] In addition to incorporating the MOU by reference in its Complaint, Compl. ¶ 24, the United States represented in court that it intended for a number of States to sign an MOU as to its requests for state voter files. Hr'g Tr. at 72:21-73:8, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Dec. 4, 2025). That MOU has since become publicly available.

agency in ways contrary to federal law.

### B. Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter, so the Requested Relief Must Fail.

Even if disclosure were appropriate, sensitive personal voter information would still be subject to redaction, which is not barred under Title III. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. The cases interpreting Section 8(i) of the NVRA are instructive, as courts have consistently permitted—and sometimes required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law and the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. § 20703; § 20507(i)(1). Courts must interpret the disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See Olmos v. Holder*, 780 F.3d 1313, 1320–21 (10th Cir. 2015) ("the canon of constitutional avoidance . . . provides that when a particular construction would raise serious constitutional problems, the court will avoid that construction" (citation omitted)).

Federal courts have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found.,*

11

*Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality). Other courts have consistently recognized that the NVRA does not compel the release of sensitive information otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), clarified on denial of reconsideration, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022). Colorado provides express protections from disclosure for social security numbers, driver's license numbers, and contact information of participants in the confidential address programs. Colo. Rev. Stat. § 1-2-302; *id.* §§ 24-30-2104, 2108, 2109.

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." The court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id*. at 334, 339; *cf. In re Coleman*, 208 F. Supp. at 200 (noting, in the

12

context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. See *Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Colorado voters and civic groups is present here. *See* Mot. to Intervene, Ex. 3, Decl. of Aly Belknap ¶¶ 6, 10–14; Ex. 4, Decl. of Kyle Giddings ¶¶ 1, 4–5; Ex. 5, Decl. of Dr. Anne R. Keke ¶¶ 6–11.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And the limited case law considering CRA records requests acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.[4]

## II. THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION AND ITS MOTION TO COMPEL SHOULD BE DENIED.

---

[4] The United States cites *Crook v. S.C. Election Comm.*, No. 2025-CP-40-06539 (S.C. Ct. C.P. Oct. 1, 2025), a non-binding decision which briefly discussed Title III in dicta. Mot. to Compel Br. at 7-8. *Crook* did not address Proposed Intervenors' arguments about the basis-and-purpose requirement or the need to redact sensitive voter information, so carries little persuasive weight.

The Federal Rules of Civil Procedure, with limited exception, "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include the claim under Title III here. *See* Fed. R. Civ. P. 81. Ignoring these standards, the United States makes expansive claims that Title III universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute [was made], explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. in Supp. of United States' Request to Compel Prod. of Recs., Dkt. No. 5 ("Mot. to Compel Br.") at 2; *see also* Compl. ¶¶ 1–4. This is contrary to the Federal Rules, not contemplated by statute, and rests on misreading a single set of non-binding cases decided sixty plus years ago, in a different circuit and a drastically different context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel Br.; *see also* Compl. ¶¶ 1–4.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel Br. at 4 n.1. But the United States studiously ignores why that is the case. *Lynd* arose in a specific historical context: the Jim Crow-era Fifth Circuit—which then included Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[5] In these states, election officials and

---

[5] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER,

14

others, including judges, notoriously used every possible means to block Black Americans from registering to vote.[6] It was against this backdrop that the Fifth Circuit noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and the purpose of the Attorney General's request was self-evident, and plenary consideration thus not required. *See id.* That court's treatment of the CRA more than sixty years cannot be divorced from its context.[7]

By contrast, here, more than sixty years later, the context of *this* request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive personal information—amid both the United States' own MOU and extensive reporting suggesting that the stated basis and purpose are pretextual, and that the data at issue is in fact being sought for unlawful ends.[8]

---

https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[6] *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

[7] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging that while "[t]he right of free examination of official records is the rule" under Title III there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

[8] *See, e.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Mag. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

Nothing in Title III insulates the sufficiency of the requirement for a "statement of the basis and the purpose" from standard judicial review. *See* 52 U.S.C. § 20703. Since *Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (citation and quotation marks omitted); *see also Powell*, 379 U.S. at 57–58 (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena). Just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data[.]"), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.").

Even in *Lynd*, the court, in explaining its findings, noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. The

16

court also noted that the CRA authorizes jurisdiction by "appropriate process" to compel production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960s, before sensitive personal information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and before any federal laws had been passed to protect and constrain access to personal information,[9] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated that the "duty to issue protective orders" would arise for certain CRA records requests, *id.* at 230.

The unredacted voter file contains "confidential, private" personal identifying information of Colorado voters that would *not* ordinarily be open to reasonable inspection. *Id.* at 231. To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required stated basis and purpose, would go even further than *Lynd* did—in a context where, very much unlike there, the basis and purpose are not inarguably clear but appear pretextual. The court presiding over the federal government's similar action in California has already recognized that the United States' motion to

---

[9] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

17

compel seeks "to reach the ultimate question in this case regarding the production of records," and "thousands of voters' lives will be impacted by this case." Hr'g Tr. at 5:3–9, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 4, 2025), Dkt. No. 100. It denied the United States' first motion to compel, *id.*, and vacated briefing on one filed the following day, ordering that the motion deadlines would be reset "at a later date following a scheduling conference held pursuant to Federal Rule of Civil Procedure 16." Order, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 15, 2025), Dkt. No. 114.

## CONCLUSION

The United States' Motion to Compel should be denied and the Complaint dismissed.

Dated:  December 19, 2025                                    Respectfully submitted,

/s/ Theresa J. Lee

Theresa J. Lee  
Sophia Lin Lakin[*]  
American Civil Liberties Union Foundation  
125 Broad Street, 18th Floor  
New York, NY 10004  
(212) 549-2500  
tlee@aclu.org  
slakin@aclu.org  

Patricia J. Yan  
American Civil Liberties Union Foundation  
915 15th Street NW  
Washington, DC 20005  
(202) 457-0800  
pyan@aclu.org

Timothy R. Macdonald, Bar No. 29180  
Sara Neel, Bar No. 36904  
American Civil Liberties Union of Colorado  
303 E. 17th Avenue, Suite 350  
Denver, CO 80203  
(303) 777-5482  
tmacdonald@aclu-co.org  
sneel@aclu-co.org  

[*]admission pending

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.

/s/ Theresa J. Lee