IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | Case Number: 1:25-cv-03967-PAB-TPO |
| JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado, | |
| Defendant. | |

**UNITED STATES' CONSOLIDATED MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS BY DEF. GRISWOLD (DOC. 40), AND PROPOSED INTERVENORS COLORADO ALLIANCE FOR RETIRED AMERICANS (DOC. 38-1)**

# Table of Contents

I.    INTRODUCTION..................................................................................... 3

II.   BACKGROUND ..................................................................................... 5

III.  MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA
AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND.......... 8

    A.   The Federal Rules of Civil Procedure are inapplicable to motions to compel under
Section 305 of the CRA. ..................................................................... 9

    b.   Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. ................... 14

    c.   Movants cannot challenge the Attorney General's basis and purpose to investigate
Colorado's noncompliance with the CRA. .................................................. 19

    d.   Colorado's SVRL falls within Section 301's broad definition of "all records and papers"
relating to registration to vote in federal elections................................... 22

    e.   The United States is entitled to unredacted "reproduction" and "copying" of Colorado's
federal election records, including its SVRL. .......................................... 28

IV.   THE UNITED STATES IS COMPLYING WITH THE PRIVACY ACT ............... 31

V.    CONCLUSION ................................................................................... 34

Plaintiff United States of America respectfully submits this Memorandum of Law in opposition to the Motions to Dismiss by Defendant Secretary of State for the State of Colorado, Jena Griswold ("Secretary Griswold") (Doc. 40) and Proposed Intervenors Colorado Alliance for Retired Americans and Britton Deford ("Proposed Intervenors") (Doc. 38-1). Collectively, Secretary Griswold and Intervenors are referred to as the "Movants." The United States submits this consolidated Memorandum, instead of two separate opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by Movants.

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Colorado's compliance with federal election laws, including the retention of records under Title III of the Civil Rights Act of 1960 ("CRA"), the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States sent correspondence to Secretary Griswold, requesting that she provide all federal election records as outlined in 52 U.S.C. § 20701; a certification that no record required for preservation has been deleted, destroyed, or altered from its original format; and all statutes, regulations, written guidance, internal policies, or database user manuals that set out Colorado's procedures. Secretary Griswold refused to produce the records as mandated by the CRA and necessary to evaluate compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

The CRA provides the principal statutory authority for the United States to immediately obtain federal election records, including Colorado's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other

acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Secretary Griswold and Proposed Intervenors have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for their motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (Doc. 2) should be granted, the Motions to

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 11-14, 18-19, 23-26.

Dismiss (Docs. 38-1 & 40) should be denied, and an order compelling production of all responsive federal election records should be entered.

## II.   BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish

5

"[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4).

Section 303 of HAVA mandates that every state "ensure that voter registration records in the State

are accurate and are updated regularly," including by use of a "system of file maintenance that

makes a reasonable effort to remove registrants who are ineligible to vote from the official list of

eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the

official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all

records concerning the implementation of programs and activities conducted for the purpose of

ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i).

Only the United States, through the Attorney General, is authorized to compel records under Title

III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52

U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all

states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of

federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes,

on May 12, 2025, the Department of Justice ("DOJ") sent Secretary Griswold, Colorado's chief

elections officer, a letter requesting, *inter alia*, a copy of all federal election records as outlined in

52 U.S.C. § 20701 ("May 12 Letter"). *See* May 12 Letter, Doc. 5-1, Ex. 1. As stated in the letter,

the basis for the demand was Title III of the CRA of 1960 codified at 52 U.S.C. § 20701, *et seq,*

and the factual basis for the demand was a complaint received by the Department of Justice

alleging noncompliance by Secretary Griswold regarding retention of election records as required

by Title III. The stated purpose of the letter was "[t]o assist [the DOJ's] efforts in evaluating the

complaint" it recently received "alleging noncompliance by your office with the duties outlined in

52 U.S.C. §20507." *Id.* The letter further requested the records be provided within 14 days of the date of the letter. *Id.*

Secretary Griswold did not produce all the records the United States requested.[2] On December 1, 2025, DOJ attorney Eric Neff followed up by e-mail to Secretary Griswold requesting Colorado's SVRL ("December 1 Email"). *See* December 1 Email, Doc. 5-1, Ex. 2. The December 1 Email further stated that "[t]he United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list" and attached the MOU, which the United States "believe[d] cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information." *Id.*

Secretary Griswold, through Deputy Secretary of State Andrew Kline, responded by email on December 3, 2025, that Colorado would not be producing unredacted voter files or signing the MOU. *See* Doc. 5-1, Ex. 3. On December 11, 2025, the Attorney General instituted these summary proceedings to compel production. *See* Compl., Doc. 1. In the Complaint, the United States indicated that the federal election records it seeks include an electronic copy of Colorado's SVRL, "with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." *Id.* at 6-7.

As explained in the attached declaration of Eric Neff, the United States seeks these documents under the CRA to evaluate a complaint alleging Colorado failed to retain documents

---

[2] The United States acknowledges that Secretary Griswold responded on May 27, 2025 and provided public SVRLs. The Secretary did not, however, provide all the records requested, including the unredacted SVRL.

necessary to evaluate Colorado's the list maintenance duties under HAVA and the NVRA . *See* 2d Decl. of Eric Neff ("2d Neff Decl.") ¶¶ 2-5; Doc. 5-2.  HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number ("SSN4"). 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections, as provided by Section 8 of the NVRA. 52 U.S.C. § 20507; 2d Neff Decl. ¶¶ 3-4.

### III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, the Motions to Dismiss by Secretary Griswold (Doc. 40), and Proposed Intervenors (Doc. 38-1) should be denied.

A. **The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.**

Movants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Def.'s Mot., Doc. 40 at 8; Proposed Intervenors' Mot., Doc. 38-1 at 5. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[3] *Id.* at 230. That approach makes sense.

---

[3] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The

The United States cannot be expected to know whether the complaint it received that Colorado failed to retain all the necessary documents required under the CRA is true before it makes the demand to Colorado. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

---

investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Movants. *See United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, slip op at 14 (W.D. Mich. Feb. 10, 2026) (attached to 2d Neff Decl. as Ex. 10). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *See* slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, slip op. at 15. The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. at 15 (D. Or. Feb. 5, 2026) (attached to 2d Neff Decl. as Ex. 12); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. at 13 & n.15 (C.D. Cal. Jan. 15, 2026) (attached to 2d Neff Decl. as Ex. 11).[4] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction,

---

[4] Movants extensively cite to *Weber* and *Oregon* in their motions. *See* Defs.' Mot., Doc. 40 at 7, 11; Proposed Intervenors' Mot., Doc. 38-1 at 2, 5-6, 9, 11 & n.7, 14. As discussed below, *Benson* addressed many of the legal errors in both decisions that call into question whether they merit any consideration.

the Federal Rules of Civil Procedure apply…" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not*.'" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is

completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[5]

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, slip op. at 13 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts to "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal

---

[5] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-26.

Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see also id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Movants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

**B.      Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Secretary Griswold argues that the only permissible purpose for a Title III request is if it is related "to curb over racial discrimination…" Defs.' Mot., Doc. 40 at 1. Proposed Intervenors similarly contend that the CRA is limited to discrimination based on race despite the absence of any language in Title III supporting their position. *See* Intervenors' Mot., Doc. 38-1 at 1, 8-10. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* a case cited by Movants, *see* Def.'s Mot., Doc. 40 at 5; Proposed Intervenors' Mot., Doc. 38-1 at 9, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*,

313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants suggest that examining compliance with the requirements of HAVA and the NVRA is incompatible with securing an individual's right to vote. *See* Defs.' Mot., Doc. 40 at 13 (arguing that a "removing voters from the rolls has nothing to do with the CRA's purpose of protecting the right to register to vote"); Proposed Intervenors' Mot., Doc. 38-1 at 9 (arguing that the CRA "has nothing to do with investigating the administrative voter registration list requirements" in HAVA and the NVRA). They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 13). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at

30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 13-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 8). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 9).

statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Movants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law – an error Movants repeat in their motions. *See* Def.'s Mot., Doc. 40 at 12-13; Proposed Intervenors' Mot., Doc. 38-1 at 9. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." Slip op. at 17. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text

includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

### C.    Movants cannot challenge the Attorney General's basis and purpose to investigate Colorado's noncompliance with the CRA.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the May 12 Letter, the Attorney General made a written demand under Section 303 of the CRA for Colorado's federal election records, including its SVRL. May 12 Ltr., Doc. 5-1, Ex. 1. The CRA provided the basis for making the request, the complaint about Secretary Griswold

not preserving factual records as required by Title III also provided a factual basis for the request, and the letter explained that the purpose of the request was "[t]o assist [the DOJ's] efforts in evaluating the complaint" it recently received "alleging noncompliance by your office with the duties outlined in 52 U.S.C. §20507." *Id.*

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Secretary Griswold criticizes the Attorney General's stated basis and purpose for demanding records not required to be retained under 52 U.S.C. § 20701.  Def.'s Mot., Doc. 40 at 10. Secretary Griswold further argues that the May 12 Letter did not "articulate[] a sufficient basis and purpose for its request...." *Id.* at 11. Proposed Intervenors make related arguments. *See* Proposed Intervenors' Mot., Doc. 38-1 at 5-8.

Federal courts have rejected contentions that parallel those made by Movants. Movants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.

Similarly, Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed

"to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating the purpose of the request was "[t]o assist [the DOJ's] efforts in evaluating the complaint" it had received. May 12 Ltr., Doc. 5-1, Ex. 1.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including Movants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 16-17 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute, as applied by federal courts.

**D.    Colorado's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not categorically exclude production of SVRLs, as Secretary Griswold argues. *See* Def.'s Mot., Doc. 40 at 10-11. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Secretary Griswold suggests.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a reason raised by Secretary Griswold: that it applies "only to documents that people *submit to*

the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." *See* Slip op. at 18-19 (emphasis added); *cf.* Def.'s Mot., Doc. 40 at 10 (arguing that the SVRL "is not a static record of any individual act of registration which would have 'come into' and stayed 'in the possession' of county clerks"). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[7] Such a reading would effectively carve out vast numbers of federal election records – or in Colorado's case nearly all its registration records – which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" Slip op. at 22. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425,

---

[7] According to the data that Colorado reported to the U.S. Election Assistance Commission, it is doubtful that millions of its federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations, with most being added electronically by Colorado's automatic registration program. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162, 164 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 24, 2026).

434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a "voter list" is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F. Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, slip op. at 22. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. Slip op. at 19. (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id*. at 1140 (defining "possess" and "possession"). Here,

24

Secretary Griswold acquired the relevant records in the course of carrying out her duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," slip op. at 19, are temporal distinctions – not

distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. And Secretary of State Griswold, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, Movants' construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This

is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued

successful matters, including in litigation, to obtain SVRLs under Title III of the CRA. For

example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs,

including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including

that Act's list maintenance requirements.[8] To ascertain whether a jurisdiction engages in practices

that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the

Attorney General needs to examine both applications to register to vote *and* the final voting rolls,

including the electronic SVRL, so as to assure herself that the applications are being properly

processed and that reasonable list maintenance efforts have been practiced. Limiting the Attorney

General's ability to anything other than *all records* would make it nearly impossible for her to

carry out the duties assigned to her by Congress.

---

[8] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 24, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff Decl., Exs. 5-7.

### E.  The United States is entitled to unredacted "reproduction" and "copying" of Colorado's federal election records, including its SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants ask the Court to legislate limitations conspicuously absent from Title III. Secretary Griswold contends that the CRA does not require disclosure of confidential personal information, arguing that states may redact such information under the NVRA. *See* Def.'s Mot., Doc. 40 at 14-15. Proposed Intervenors argue that Title III does not preempt state privacy laws prohibiting disclosure of sensitive information in voter files, including social security numbers and driver's license identification numbers. *See* Proposed Intervenor's Mot., Doc. 38-1 at 10-12.

These arguments miss the mark. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or

> paper produced pursuant to this chapter, or any reproduction or copy, except
> to Congress and any committee thereof, governmental agencies, and in the
> presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701.

In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Colorado's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Secretary Griswold and Proposed Intervenors that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[9] *See Lynd*, 306 F.2d at 230.

---

[9] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* 2d Neff Decl. ¶ 16. As of February 24, 2026, thirteen states have provided their SVRLs without any MOU. *Id.*

Finally, if Movants' position were to be adopted, it would eviscerate Title III. The Attorney

General can only meaningfully investigate and enforce list maintenance requirements under HAVA

and the NVRA by having access to the voter identification numbers required by federal law. For

each voter, that includes a driver's license number, SSN4, or other HAVA identifying number. *See*

52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration

records, registrants who have moved, and registrants who have died, or who are otherwise no

longer eligible to vote in federal elections.[10] There is no question that enforcement of the list

maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible

violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-

43 (confirming compliance with federal law is a legitimate purpose); *Benson*, slip. op. 17

(assessing compliance with the NVRA is a legitimate purpose under the CRA).

The data the United States has requested under the CRA is the same that twenty-five states

(including Colorado) and the District of Columbia routinely share through the Electronic

Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-

maintenance requirements.[11] Similarly, private parties have been granted access to even more

---

Two states have agreed to provide their SVRL under the terms of the MOU. *Id*. Three other states
have indicated their intention to provide the SVRLs in the near future. *Id*.

[10] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections
for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort
to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A)
the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. §
21083(a)(4) ("The State election system shall include provisions to ensure that voter registration
records in the State are accurate and are updated regularly, including… (A) A system of file
maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from
the official list of eligible voters.").

[11] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 24, 2026).

detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Colorado's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

## IV.    THE UNITED STATES IS COMPLYING WITH THE PRIVACY ACT

Proposed Intervenors argue that the United States must comply with the Privacy Act, and the United States is doing that. *See* Proposed Intervenors' Mot., Doc. 38-1 at 13-15. But they go even further, contending that "[t]he Privacy Act independently prohibits DOJ from obtaining Colorado's voter registration list." *Id.* at 13. Contrary to what Proposed Intervenors suggest, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. Proposed Intervenors – and *Weber* – incorrectly refer to only the three SORNs issued by the Civil Rights Division, without addressing any of the dozens of Department of Justice SORNS that are summarized in the table in the May 25, 2017 SORN. *See* Proposed Intervenors' Mot., Doc. 38-1 at 14 & n.10. Indeed, Proposed Intervenors go even further; although they acknowledge the May 25, 2017 SORN, they dismiss it out of hand, arguing it does not "contain[] a routine use that is remotely applicable" without any comment on the four pages of Department of Justice SORNs in the table published with that SORN. *Id.*

The SORNs and Privacy Policy issued by the Department of Justice elaborate on the procedures that the Proposed Intervenors have ignored. The statutes cited for routine use include HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to the CRA to investigate a complaint it received that Colorado was violating Section 8 of the NVRA. *See* May 12 Letter, Doc. 5-1, Ex. 1. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Proposed Intervenors contend through presumed third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to build a nationwide voter registration database." Proposed Intervenors' Mot., Doc. 38-1 at 1. Rather, the records sought from Colorado are necessary to perform an individualized assessment of the State's efforts to comply with Section 8 of the NVRA.[12] 2d Neff Decl. ¶ 5. Similar efforts to perform individualized assessments of HAVA and NVRA compliance are underway in all but one other state (North Dakota, which does not register voters). That approach is consistent with the Attorney General's enforcement function that Congress authorized in those statutes, performed in a neutral and non-partisan manner. *See* 52 U.S.C. § 21111 (HAVA); 52 U.S.C. § 20510(a) (NVRA). The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

At bottom, Proposed Intervenors' arguments are grounded in their disagreement with the requirements codified in the CRA, HAVA, and the NVRA. But those statutes reflect policy choices made by Congress, not the federal courts. Because the United States is complying with the statutory mandates for protecting voter privacy contained in Section 304 of the CRA and in the Privacy Act, their motion to dismiss on privacy grounds should be denied.

---

[12] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. 2d Neff Decl. ¶ 6.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss by Secretary Griswold (Doc. 40) and Proposed Intervenors (Doc. 38-1) be denied and the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 2) be granted.

Dated: February 24, 2026

Respectfully submitted,


HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

 /s/ *Jonathon P. Hauenschild*
JONATHON P. HAUENSCHILD
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.923
Washington, D.C. 20002
Jonathon.Hauenschild@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, a true and correct copy of the foregoing document was served via the email to all counsel of record.

/s/ *Jonathon P. Hauenschild*
JONATHON P. HAUENSCHILD
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20002
Telephone: (202) 307-2767