**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

UNITED STATES OF AMERICA,

       Plaintiff,

   v.

JENA GRISWOLD, IN HER OFFICIAL
CAPACITY AS SECRETARY OF STATE
FOR THE STATE OF COLORADO,

       Defendant.

Case No. 1:25-cv-03967-PAB-TPO

**BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE
NATIONWIDE AS AMICI CURIAE IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS**

**Table of Contents**

INTRODUCTION AND INTEREST OF AMICI.........................................................................1

ARGUMENT        .......................................................................................................................2

    A.    The states, not the federal government, are charged with administering
        federal elections. ............................................................................................2

        1.    The U.S. Constitution mandates the states' role in regulating and
               administering elections. ..................................................................2

        2.    The Constitution prioritizes the states' accountability to voters. ...............3

        3.    Federal legislation confirms states' authority over voter roll list
               maintenance. ..................................................................................4

    B.    State voter files contain sensitive information that states must protect to
        ensure voters' privacy..................................................................................6

    C.    States have good reason to collect confidential information, but not share
        that information with third parties, including federal agencies. ...........................9

    D.    The Federal Privacy Act prohibits DOJ's conduct here. ....................................12

CONCLUSION    ....................................................................................................................15

**Table of Authorities**

**Cases**

*ACA Connects - Am.'s Commc'ns Ass'n v. Frey*,
471 F. Supp. 3d 318 (D. Me. 2020) ....................................................................................8

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960), ................................................................................7, 8

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .............................................................................................5

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .........................................................................................................1

*Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*,
570 U.S. 1  (2013) ....................................................................................................2, 3, 4

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) ..............................................................................................3

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .........................................................................................5

*Bellville v. Town of Northboro*,
375 F.3d 25 (1st Cir. 2004) ...............................................................................................8

*Branti v. Finkel*,
445 U.S. 507 (1980) .........................................................................................................13

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) .............................................................................2, 3

*Chapman v. Houston Welfare Rts. Org.*,
441 U.S. 600 (1979) .........................................................................................................5

*Fish v. Kobach*,
89 F. Supp. 3d 1107 (D. Kan. 2016) .................................................................................5

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) ............................................................................................3

*Harkless v. Brunner*,
545 F.3d 445 (6th Cir. 2008) ............................................................................................3

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .................................................................................8

*In re Gordon*,
218 F. Supp. 826 (S.D. Miss. 1963) .................................................................................8

*League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*,
780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................................2, 4

*Libertarian Party of Va. v. Alcorn*,
    826 F.3d 708 (4th Cir. 2016) ................................................................................................3

*Moore v. Harper*,
    600 U.S. 1 (2023) ..................................................................................................................2

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016)..................................................................................7

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ....................................................................................................7

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) .................................................................................................5

*Smiley v. Holm*,
    285 U.S. 355 (1932) ..............................................................................................................2

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) ................................................................................................................6

*True the Vote v. Hosemann*,
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ...................................................................................7

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ..............................................................................................................2

*United States v. Gradwell*,
    243 U.S. 476 (1917) .......................................................................................................3, 4, 9

**Statutes**

5 U.S.C. § 552a(a)(3)..................................................................................................................14

5 U.S.C. § 552a(a)(5)..................................................................................................................14

5 U.S.C. § 552a(e)(11)................................................................................................................14

5 U.S.C. § 552a(e)(4)..................................................................................................................14

5 U.S.C. § 552a(e)(7)..................................................................................................................13

52 U.S.C. § 20507(a)(4) ...............................................................................................................5

52 U.S.C. § 20507(i)......................................................................................................................7

52 U.S.C. § 20701 .........................................................................................................................8

52 U.S.C. § 21083 .........................................................................................................................7

52 U.S.C. § 21083(a)..................................................................................................................5, 6

**Other Authorities**

3 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911)...................................4, 9

Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025) ........................................................................12

*Cyber Threat Snapshot*, House Committee on Homeland Security ...............................................10

Cybersecurity & Infrastructure Security Agency, *Election Security* ............................................................................................................................................. ....................................................................................................................................................10

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9, 2025) ...............................................................15

*Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024).........................................................................................................................................10

Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025).........................................................................................................................................10

Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017) ..........11

Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025) ..............................12

Matt Cohen & Zachary Roth, *DOJ Is Said to Plan to Contact All 50 States on Voting Systems*, Democracy Dkt. (July 29, 2025)......................................................................15

Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025) ........................................................................9

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025) ...........................................................................................6

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016) ...................................14

Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017) .................................................................................................1

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy (1976) ...............................................................................13

Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025)..............................................................................................4

*The Federalist* No. 59 (Alexander Hamilton) (Clinton Rossiter ed., 1961)...................................4

Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J....................................................................1

U.S. Dep't of Just., Overview of the Privacy Act of 1974 (2020 ed.).........................................13

iii

U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action
Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024) ..................9

*US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025)........ 9-10

*US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters
(Oct. 15, 2025)......................................................................................................................9

William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993*
(May 20, 1993) ...................................................................................................................5

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ........................................................................................................2

**INTRODUCTION AND INTEREST OF AMICI**

Amici—a bipartisan group of former secretaries of state including from Colorado, *see* Appendix A—faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici participated in fulfilling the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (citation modified).

In the matter before this Court, the United States seeks an order directing the Secretary of State of Colorado to turn over to the U.S. Department of Justice a computerized voter registration list of over four million registered voters, inclusive of "all fields." Compl. at 6, ¶ 28. That action would upend our constitutional framework by interfering with Colorado's management of its voter registration system and protection of sensitive voter information, including driver's license and social security numbers. The Government's demand is contrary to the federalism and separation of powers principles codified in both the Constitution's Elections Clause and federal law. As the District Court for the Central District of California recently concluded in dismissing with prejudice a nearly identical lawsuit against the State of California, "[t]he centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy." *United States v. Weber,* --- F.Supp.3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *20 (C.D. Cal. Jan. 15,

2026); *see also United States, v. State of Oregon*,  --- F.Supp.3d ----, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789, at *6 (W.D. Mich. Feb. 10, 2026).

## ARGUMENT

### A. The states, not the federal government, are charged with administering federal elections.

#### 1. The U.S. Constitution mandates the states' role in regulating and administering elections.

The Constitution explicitly gives states, not the federal government, the primary responsibility to enact election laws and administer elections. The Elections Clause establishes: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

The Constitution thus empowers the states with "sweeping" authority to enact election laws, subject only to other provisions of the Constitution and preemption by Congress. *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 780 F. Supp. 3d 135, 158 (D.D.C. 2025). The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 8-9 (2013) (emphases added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *California v. Trump*, 786 F. Supp. 3d 359, 372 (D. Mass. 2025), *appeal filed*, No. 25-1726 (1st Cir. Aug. 1, 2025) (same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [and 2] upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S.  at 8 (citing *U.S. Term Limits*, 514 U.S.

at 804-05); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (states hold "constitutional duty to craft the rules governing federal elections"). "In other words, only Congress has the power to adjust state election rules." *California*, 786 F. Supp. 3d at 379.

In addition to assigning states the primary responsibility to regulate elections, the current regime enacted pursuant to the Elections Clause also makes states responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures."), *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (stating Elections Clause "reserv[es] to the States default responsibility for administering federal elections").

"There is an inherent level of trust that comes along with Americans voting locally. This is why, since the founding of our nation, the Elections Clause has constitutionally prevented the centralization of election management in the Executive by affording states the power to determine the 'times, places and manner of holding elections.'" *Weber*, 2026 WL 118807, at *2; *see also Oregon*, 2026 WL 318402, at *1. In sum, it has long been "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," subject only to Congress' power "to regulate such elections . . . by positive and clear statutes." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

### 2.    The Constitution prioritizes the states' accountability to voters.

The Elections Clause reflects the Framers' view that, given state officials' accountability and proximity to local needs, states are well-situated to regulate and administer federal elections, subject only to Congressional preemption. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input

and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787* 391 (Max Farrand ed., 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." *The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord Gradwell*, 243 U.S. at 484-85; *LULAC*, 780 F. Supp. 3d at 159. And although the Constitution allows Congress to act as a check on a runaway state legislature's regulation of elections, nowhere does it authorize the President to do so without clear authorization from the legislative branch. *See generally Gradwell*, 243 U.S. at 484–85. There is no such authorization here. In fact, as discussed below, Congress has prohibited the federal government's attempted actions presently at issue in this case.

### 3. Federal legislation confirms states' authority over voter roll list maintenance.

Congress and the President recognized this truth when they adopted the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). The NVRA was enacted in 1993 to help increase voter registration by, among other things, requiring states to offer voter registration opportunities when individuals apply for or renew a driver's license. *See, e.g.*, Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025). HAVA was enacted in 2002 to help states modernize their election systems in response to voting problems in the 2000 presidential election. *Id.* at 12. Both statutes reaffirmed the states' authority over election management. The NVRA and HAVA provide federal assistance to state election officials, but they do not limit or otherwise undermine the states' plenary authority over

4

election management.

Under both the NVRA and HAVA, the states—not federal agencies—are responsible for voter roll list maintenance. In interpreting the NVRA and HAVA, the courts must "interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 608 (1979). Here, the text of both the NVRA and HAVA is unequivocal: *States* are responsible for voter roll list maintenance.

Specifically, the NVRA, 52 U.S.C. § 20507(a)(4), provides that "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." (emphasis added). The NVRA's "text unambiguously mandates that the states maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019). The same is true regarding HAVA, which repeatedly requires states to define, maintain, and administer voter lists. *See* 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A); *see also Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA requires states to 'perform list maintenance' of the computerized voting rolls.").

Because the text of the NVRA and HAVA makes clear that states are charged with voter roll list maintenance, any interpretation to the contrary must be rejected. Further, "[n]owhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004). The NVRA, which primarily achieves its objectives by "creating national registration requirements for federal elections," *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1113 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016), likewise authorizes, and relies on, the states to implement and facilitate its provisions. *See* William J. Clinton, *Remarks on Signing the National Voter Registration Act of*

*1993* (May 20, 1993), https://perma.cc/AHT3-H4S8 (NVRA's "implementation by States").

### B.  State voter files contain sensitive information that states must protect to ensure voters' privacy.

Each state's voter files contain sensitive nonpublic information about voters, which states have both a right and an obligation to protect. Federal law requires that every application for registration in a federal election contain *at least* the voter's driver's license ("DL") number, the last four digits of the voter's social security number ("SSN"), or other unique identifying information. 52 U.S.C. § 21083(a)(5)(A). Voter files commonly include additional nonpublic information about voters beyond what is federally mandated, such as addresses, phone numbers, birth dates, and full SSNs. *See, e.g.*, National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/emnvjnj5 (aggregating information about the contents of state voter rolls). This information is generally not publicly available;[1] states have an interest in protecting it from disclosure. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) ("[T]he duty of the State" to protect privacy of its residents "cannot be doubted.").

In fact, many states have enacted statutes either prohibiting disclosure of confidential information contained in the voter file or limiting the use of such information, including four of the states from which Amici hail.[2] Additionally, 44 states—including Colorado—and the District of Columbia have either an address confidentiality program ("ACP") or a "Safe at Home" law that provides additional confidentiality protections for certain groups of voters, such as victims

---

[1] Colorado law protects from disclosure voters' social security numbers, driver's license numbers, and full birth dates. C.R.S. §§ 1-2-302(8); 24-72-204(8). It also protects certain "confidential" voters who may be put at increased risk of criminal harassment or bodily harm if included on the public voter registration list, such as judges, law enforcement, and people with protection orders. § 24-72-204(3.5)(b).

[2] National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/emnvjnj5.

of domestic violence, sexual assault, stalking, and other crimes. *See* Colo. Rev. Stat. § 24-30-2108, *et seq*. These voter groups are at elevated risk of harassment, violence, and other harms if the confidential information in their voter files is disclosed, and states have a heightened interest in protecting their citizens from these harms by keeping confidential voter information private.

Moreover, there is nothing in the NVRA or HAVA that supersedes—or even conflicts with—these state confidentiality rules and protections. The NVRA's public disclosure provision contains no mention of confidential information and no requirement that such information be disclosed. *See* 52 U.S.C. § 20507(i). To the contrary, several jurisdictions have expressly recognized that states can refuse to turn over confidential information contained in the voter file without running afoul of the NVRA. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *see also True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016).

Nor does HAVA conflict with state confidentiality rules. That statute does not even contain a public disclosure requirement, let alone a requirement that state agencies turn over confidential voter information to the federal government. *See generally* 52 U.S.C. § 21083. Thus, states can comply with their obligations under the NVRA and HAVA without acceding to federal demands for confidential information. Indeed, they must do so when state law requires it.

Similarly, states need not disclose confidential information about their voters to comply with the Civil Rights Act of 1960 ("CRA"). The CRA allows the United States Attorney General to request inspection of state voter rolls for the purpose of investigating "alleged discriminatory practices." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). But the federal government does not allege any discriminatory practices here. And even assuming the Attorney General were

7

to request inspection of voter rolls in for legitimate purposes of a civil rights investigation (which is not the case here), there is no reason to believe that states cannot comply with the CRA's inspection provision while also protecting the confidentiality of sensitive voter information.[3]

Indeed, the CRA and voter confidentiality protections are properly read in harmony. The purpose of the CRA was to allow the Attorney General to investigate the alleged disenfranchisement of voters based on race. *Gallion*, 187 F. Supp at 854. It does not give federal officials an unfettered right of access to confidential information about voters in general. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("It is . . . a mistaken view to assume that [an] investigation of [state voting] records is an unlimited discovery device which may be employed and used without restraint . . . ."); *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (recognizing exception to inspection right "when the purpose is speculative, or from idle curiosity"), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). States can comply with the CRA while also protecting confidential voter information as courts have repeatedly recognized in other contexts.

Simply put, "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber,* 2026 WL 118807, at *12; *see also Oregon*, 2026 WL 318402, at *11. Nothing in these statutes requires that states turn over voters' personally

---

[3] Nothing in the text of the CRA's records provisions preempts state privacy protections and preemption is not implied. *See generally* 52 U.S.C. §§ 20701-20706 (no mention of preemption). There is "a strong presumption against implied federal preemption of state law," which is strongest "in fields of traditional state regulation." *ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citation omitted). "Privacy regulation is just such a field." *Id*.; *see also Bellville v. Town of Northboro*, 375 F.3d 25, 31 (1st Cir. 2004) ("The states, of course, are free to accord their citizens rights beyond those guaranteed by federal law."). There is no statutory or case law authority suggesting that a state cannot take appropriate steps to protect confidential information about its residents while also complying with the CRA.

identifiably information ("PII").

      **C.**      **States have good reason to collect confidential information, but not share that information with third parties, including federal agencies.**

As described above, because states administer elections, state law governs the circumstances and authorized officials who must collect voters' confidential information as part of the voter registration process. But it does not follow that just because *states* possess voters' confidential information, the federal government is authorized to access it, nor that voters want that information shared with any other third parties, including the federal government.

As the founders recognized, state governments are "best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity and prevent its own dissolution." *Gradwell*, 243 U.S. at 484 (quoting 3 *Records of the Federal Convention of 1787* 311 (Max Farrand ed., 1911)). And there are also practical concerns with states sharing and the federal government aggregating sensitive voter information. There always is a risk that electronically stored data could be hacked, breached, or stolen. And each time data is shared, that risk necessarily increases, both during the transfer process and because each custodian of records adds an additional target.

The federal government's efforts to create a national voter roll for the first time therefore compound the risk of exposing private voter information. Moreover, the federal government is an especially attractive target for hackers, particularly for those working on behalf of nation-states. Federal agencies reported over 30,000 security incidents in fiscal year 2022 alone. U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024). The threat of such attacks is only growing. *See US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025), https://perma.cc/E8E2-ZEGX; *see also* Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025), https://tinyurl.com/yawfc677 ("A new report . . . is challenging the idea that

federal institutions are more secure than local governments against cybersecurity threats."). Indeed, just in November, the U.S. Congressional Budget Office was breached by hackers. *US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025), https://perma.cc/Y64D-JMQN/.

In addition to federal targets being particularly sought after by hackers, the Department of Homeland Security designates election infrastructure as "critical infrastructure," which "recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." Cybersecurity & Infrastructure Security Agency, *Election Security*, https://perma.cc/U6MC-F3C3 (last visited Nov. 18, 2025). In making that designation, DHS "cited cyberattacks on American systems as potentially more sophisticated and dangerous than ever, and elections as a primary target of cyber criminals." White Paper delivered to National Association of Secretaries of State, *Securing Elections Critical Infrastructure* 3 (2020), https://perma.cc/48MC-C49D.

Unsurprisingly, even since that designation, critical infrastructure remains squarely in the crosshairs of hackers. In 2024, roughly 70% of all cyberattacks involved critical infrastructure. *Cyber Threat Snapshot*, House Committee on Homeland Security, https://perma.cc/R829-ZN25 (last visited Nov. 18, 2025). That trend maps onto increased cyber attacks on election systems globally. *Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024), https://perma.cc/KNV2-7EHP. And concerns about the security of American election infrastructure are even more pronounced now after the federal government recently downsized and cut funding for the Cybersecurity and Infrastructure Security Agency, which is tasked with protecting—among other things—election infrastructure. *See* Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025), https://perma.cc/XR9D-ZCRT. Experts, including current Arizona Secretary of State Adrian Fontes, are sounding the

alarm that changes during the current administration are further weakening the country's already strained cyber election protection apparatus. *Id.* By trying to force states to send their otherwise disparate sets of sensitive voter information all to the same repository, the federal government is only making the bullseye brighter for bad actors, while simultaneously removing obstacles between hackers and their targets.

The concerns do not end there. The federal government has a long and checkered history of infringing on individuals' privacy rights, including concerning confidential voter information. In 2017, the Presidential Advisory Commission on Election Integrity sent letters to state election officials across the country seeking all publicly available voter roll data, including all registrants' full first and last names, middle names or initials, addresses, dates of birth, political party, last four digits of Social Security numbers if available, voter history from 2006 onward, information regarding any felony convictions, voter registration in another state, and military status. Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), https://perma.cc/J7TA-ALKV. State officials—sometimes colorfully—expressed grave concerns. Kentucky Secretary of State Alison Lundergan Grimes said there was "not enough bourbon here in Kentucky to make this request seem sensible. . . . Not on my watch are we going to be releasing sensitive information that relate to the privacy of individuals." Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1, 2017), https://perma.cc/QF7G-MV8G. She explained, "I'm not going to risk sensitive information for 3.2 million Kentuckians getting in the wrong hands, into the public domain and possibly for the wrong reasons, to keep people away from the ballot box." Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017), https://perma.cc/2AEE-AL4E. Mississippi Secretary of State Delbert Hosemann emphasized that states "conduct[] our own electoral processes," and suggested "[the

11

Commission] can go jump in the Gulf of Mexico and Mississippi is a great State to launch from." *Id.*

The same concerns about sharing voters' sensitive and confidential information with the government apply with equal force now, as to states' justifications for choosing not to do so. Indeed, in a recent letter to Attorney General Pam Bondi and Homeland Security Secretary Kristi Noem, the Colorado Secretary of State, as well as secretaries of state from Arizona, California, Maine, Minnesota, Nevada, New Mexico, Oregon, Vermont, and Washington, demanded answers on how private voter data was being used by the federal government. Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025), https://perma.cc/3U4N-PWXB. The secretaries noted, among other concerns, that their states' voter registration lists include sensitive voter information, including dates of birth, state driver's license numbers, and the last four digits of Social Security numbers. *Id.*

Alarmingly, recent reporting suggests that DOJ is considering sharing the state voter rolls DOJ obtains with partisan organizations such as the Election Integrity Network. *See* Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025), https://perma.cc/W8UC-XHRS. This is especially concerning given the federal government's increasingly coercive efforts to collect voter PII, such as in Minnesota, where the U.S. Attorney General sent a letter to the Governor—merely days after federal agents killed two American citizens in Minneapolis—conditioning withdrawal of federal agents from Minnesota on the state turning over its voters' data to the federal government.[4]

### D.    The Federal Privacy Act prohibits DOJ's conduct here.

The Court cannot grant the relief the Government seeks without violating the Privacy Act

---

[4] Jeff Wald, *Minneapolis shooting: AG Pam Bondi gives Gov. Walz conditions for ICE to leave Minnesota*, FOX 9 Minneapolis-St. Paul (Jan. 25, 2026), https://perma.cc/9EME-ZREP; *see also* https://perma.cc/KE7Q-5FJJ (full text of demand letter).

12

of 1974. For precisely the sort of reasons described by the secretaries above, the Privacy Act places limits on a state's ability to share sensitive information with federal agencies. Congress passed the Privacy Act in response to the Watergate and Counterintelligence Program scandals, which exposed the dangers of unchecked government domestic surveillance and data collection. The Privacy Act was designed to place "limits upon what the Government can know about each of its citizens." U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE (citation omitted). Accordingly, the Privacy Act "sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy." *Id.*

To that end, Congress sought to prevent the federal government from creating "formal or de facto national data banks" or "centralized Federal information systems." S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE. Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "regard for privacy of the individual, confidentiality of data, and security of the system." *Id.* at 884, 217.

DOJ's actions here contravene many of the Privacy Act's requirements. First, the Privacy Act forbids collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Here, DOJ explicitly requests "all fields" from Colorado's electronic statewide voter registration list. Compl. at 6, ¶ 28. By requesting all fields, DOJ is seeking, for example, each voter's party registration, which is one way in which an individual exercises rights guaranteed by the First Amendment. *See Branti v. Finkel*, 445 U.S.

13

507, 519 (1980) (holding political party affiliation is protected under the First Amendment). The request thus violates the Privacy Act. *See Weber*, 2026 WL 118807, at \*17 ("The Privacy Act bars DOJ's request for California's unredacted voter roll because fulfillment of that request would include information regarding previous election participation and party affiliation.").

Second, the Privacy Act imposes procedural guardrails on what agencies must do prior to establishing a "system of records," defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Any time the federal government "maintain[s], collect[s], use[s], or disseminate[s]" such, records, it *must* abide by notice-and-comment requirements and safeguards against data misuse, and follow information-security mandates. *Id.* at § 552a(a)(3), (e)(1)–(12). Critically, when an agency establishes or revises any system of records, it "shall" "publish in the Federal Register . . . a notice of the existence and character of the system of records," *id.* § 552a(e)(4), called a System of Records Notice ("SORN"). And at least 30 days *prior* to such publication, an agency must publish a "notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Issuance of a SORN is not mere window-dressing. SORNs "shall include" nine categories of information. *Id.* § 552a(e)(4). These crucial details provide much needed transparency about how the federal government is protecting both the information in the system of records and how it intends to use the information. And publishing a SORN is mandatory: "*In no circumstance* may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal Register* publication." Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67 (emphases added). Moreover,

14

agencies "shall" not only solicit but also review any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* The "requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering agency accountability through public notice." *Id.* at 5.

Here, DOJ has not published a SORN nor any other notice describing how it intends to use the state voter roll data it is attempting to collect. Failure to issue such a notice is, itself, a violation of the Privacy Act. This lack of transparency also raises serious privacy concerns for Colorado voters, who entrusted their personal information to the State—not to the federal government. And this significant privacy concern is not confined to Colorado. DOJ has publicly stated that it intends to seek voter roll records from all 50 states. Matt Cohen & Zachary Roth, *DOJ Is Said to Plan to Contact All 50 States on Voting Systems*, Democracy Dkt. (July 29, 2025), https://perma.cc/H8HL-BDGU. Indeed, DOJ has already sued 29 states, the District of Columbia, and one county for declining to provide such data. These actions are consistent with DOJ's broader effort to build a "national voter roll." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9, 2025), https://tinyurl.com/2m7bhh58. But doing so contravenes the Privacy Act's prohibition on national data banks and violates its transparency requirements. "[T]he Privacy Act remains a protection for the American people. Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of [Coloradans]." *Weber*, 2026 WL 118807, at *18.

## CONCLUSION

For the reasons stated above, Amici respectfully request that the Court grant Defendant's motion to dismiss.

DATED: March 2, 2026                              /s/ Isabel J. Broer

                                                 ISABEL J. BROER
                                                 ibroer@olsongrimsley.com
                                                 Olson Grimsley Kawanabe Hinchcliff &
                                                 Murray LLC
                                                 700 17th Street, Suite 1600
                                                 Denver, CO 80202
                                                 Telephone: 303.535.9151

                                                 DONALD K. SHERMAN*
                                                 JOHN B. HILL*
                                                 dsherman@citizensforethics.org
                                                 jhill@citizensforethics.org
                                                 Citizens for Responsibility and Ethics in
                                                 Washington
                                                 PO Box 14596
                                                 Washington, DC 20004
                                                 Telephone: 202.408.5565
                                                 *application for admission pro hac vice
                                                 forthcoming

16

## APPENDIX A: Biographies of *Amici Curiae*

**Mary Estill Buchanan, Former Secretary of State for the State of Colorado** – The Colorado Secretary of State is an elected member of the Executive Branch of Colorado's state government. The Secretary of State serves as the chief executive of an office that oversees and administers many laws, including the Colorado Election Code, Voter Registration Laws, and Campaign Finance Laws.

Secretary Buchanan was a public servant in Colorado for many years and a tireless advocate for democracy and women in public service. Most relevant here, Buchanan served two terms as Colorado's Secretary of State—from 1974 to 1983—as a Republican. When she took office, she was the first woman to hold that office in Colorado. During her tenure, Buchanan was the only Republican in statewide office, working across the aisle to ensure efficient, effective administration of Colorado's elections. As Secretary, Buchanan advocated for and implemented reforms to improve transparency for elections and public office.

**Miles Rapoport, Former Secretary of State for the State of Connecticut** – The Secretary of State of Connecticut is the Commissioner of Elections for the State. The Secretary is charged with administering, interpreting, and implementing election laws and ensuring fair and impartial elections. The Elections and Voting Division of the office administers, interprets, and implements all state and federal laws pertaining to elections, primaries, nominating procedures, and the acquisition and exercise of voting rights.

Secretary Rapoport was elected Secretary of the State as a Democrat in 1995 and served until 1998, leading multiple initiatives to expand voting and election participation. Before that, Rapoport served five terms in the Connecticut House of Representatives, from 1984 to 1994, chairing the Committee on Elections. Since 2021 he has served as the Executive Director of 100% Democracy, an initiative committed to promoting a more representative democracy. He is

1

the co-author, with *Washington Post* columnist E.J. Dionne, of *100% Democracy: The Case for Universal Voting,* published in March 2022 by the New Press.

**Ben Ysursa, Former Secretary of State for the State of Idaho** – The Idaho Secretary of State is an elected constitutional officer within the executive branch of the state government. The Secretary's Elections Division works to ensure the accuracy and integrity of Idaho's elections, to ensure every voice is heard and every vote is counted properly.

Secretary Ysursa was elected Idaho's 26th Secretary of State on November 5, 2002, and was re-elected in 2006 and 2010. While serving as Secretary, Ysursa was an active member of the National Association of Secretaries of State, serving as co-chair of the Company Formation Task Force. Secretary Ysursa started his professional career serving first as Deputy Secretary of State from 1974 to 1976 and then as Chief Deputy Secretary of State from 1976-2002. He has conducted numerous workshops on elections for county, city and district officials throughout the state and has authored various manuals.

**Joan Anderson Growe**, **Former Secretary of State for the State of Minnesota** – The Secretary of State of Minnesota is an elected constitutional officer serving in the state's executive branch. One of the office's primary responsibilities is overseeing statewide elections and operating the statewide voter registration system.

Secretary Growe served first in the Minnesota House of Representatives before being elected as Minnesota Secretary of State as a Democrat. When she was elected, Growe became the first woman to be elected to a Minnesota statewide office without having been first appointed. During her six-term tenure, Growe was tireless in her advocacy of voter participation, and, for most of her tenure, Minnesota led the nation in voter turnout.

**John Gale, Former Secretary of State for the State of Nebraska** – The Secretary of State serves as Nebraska's chief election officer. Working with election officials in the state's 93

2

counties, the Elections Division oversees election law, the conduct of elections in the state, election tabulation equipment and the state voter registration system.

Secretary Gale served as Nebraska Secretary of State from December 2000 until 2019, winning election to the office as a Republican four times. While in office he significantly improved Nebraska's election process, including implementing major election improvements in Nebraska to meet the requirements of the federal Help America Vote Act. Under Secretary Gale's leadership, all Nebraska counties received new ballot tabulation equipment and switched to a computerized statewide voter registration system. He also promoted efforts to increase voter participation, resulting in Nebraska setting new turnout records in both the 2004 and 2008 presidential elections. Secretary Gale is a 5th generation Nebraskan, practicing law in North Platte for 29 years before being appointed Secretary of State. He served as legislative assistant to U.S. Senator Roman Hruska and as an assistant U.S. Attorney in Omaha and Lincoln.

**Phil Keisling, Former Secretary of State for the State of Oregon** – The Oregon Secretary of State is an elected constitutional officer within the executive branch of the state government. One of the Secretary's chief roles is to oversee the state's election system, to maximize voter participation, and to protect ballot security.

Secretary Keisling's career over four decades has included stints in the worlds of journalism, elective politics, the private sector, and academia. In 1991, Keisling was appointed Oregon Secretary of State by Governor Barbara Roberts. He was then elected and re-elected as a Democrat to this statewide position. During his tenure, he helped lead the successful effort to make Oregon the nation's first state to conduct all elections only by mail. Keisling is also the chair of the board of directors of the National Vote At Home Institute, a nonpartisan, 501(c)(3) nonprofit organization that works to increase voters' access to, use of, and confidence in mailed-out ballots.

3

**Kathy Boockvar and Leigh Chapman, Former Secretaries of the Commonwealth of Pennsylvania** – The Secretary of the Commonwealth is the chief state election official in Pennsylvania and leads the Pennsylvania Department of State. The Department of State is responsible for ensuring the security, integrity, and accessibility of the electoral process in Pennsylvania, by overseeing free, fair, and accurate elections.

Secretary Boockvar served as the Secretary of the Commonwealth from 2019 until 2021, and before that as Senior Advisor on election security, under Governor Tom Wolf (D). Boockvar was also co-chair of the National Association of Secretaries of State's Elections Committee from 2019 to 2020 and as a Representative on the Election Infrastructure Subsector Government Coordinating Council (EIS-GCC), a collaboration among federal, state, and local officials. During her tenure, Boockvar co-chaired Pennsylvania's Inter-Agency Election Security and Preparedness Workgroup, strengthened election security and voting rights measures across the state, and oversaw secure and accessible elections amid a global pandemic, marked by unparalleled transparency and voter participation. In prior years, Boockvar served as a poll worker and as a voting-rights attorney for a national civil rights organization and has been dedicated to public service throughout her career. After serving as Secretary, Boockvar became Vice President of Election Operations for the Center for Internet Security, and she is currently President of Athena Strategies, continuing work to strengthen election security and amplify understanding and civil discourse about elections.

Secretary Chapman served as the acting Secretary of the Commonwealth from January 2022 until January 2023. Chapman also previously held the position of Policy Director for the Pennsylvania Department of State, from July 2015 until May 2017. In that role, Chapman managed the Department's policy and regulatory development process in coordination with the Governor's Office of Policy, including in the elections program area. Chapman also has served as the Executive Director for Deliver My Vote, the Voting Rights Program Director at The

4

Leadership Conference on Civil and Human Rights, as a Senior Policy Advisor at Let America Vote, and as a Staff Attorney at the Advancement Project in the Voter Protection Program.

**Sam Reed, Former Secretary of State for the State of Washington** – The Secretary of State of Washington is the state's chief elections officer. The Secretary of State serves as an elected constitutional officer with rule-making authority. The duties of the office included maintaining the statewide voter registration database, overseeing state and local elections, certifying the results of state primaries and general elections, filing and verifying statewide initiatives and referendums, and producing and distributing the state voters' pamphlet and election-notice legal advertising.

Secretary Reed served the citizens of Washington for over three decades in elected public office. At the age of 28, Reed was appointed assistant Secretary of State, and was chosen by Governor Dan Evans to head the Governor's Advisory Council on Urban Affairs. Reed was elected as a Republican to serve as Washington's fourteenth Secretary of State in 2000—a title which he held until his retirement in January 2013. His many accomplishments included major election reform, including a new statewide voter registration system that prevents opportunity for fraud.